J-S26016-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF : Q.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3650 EDA 2017 |

Appeal from the Order Entered October 11, 2017
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): CP-51-AP-0000578-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: N.H.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Q.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3652 EDA 2017 |

Appeal from the Order Entered October 11, 2017
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): CP-51-AP-0000579-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: J.J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Q.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3657 EDA 2017 |

Appeal from the Order Entered October 11, 2017
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): CP-51-AP-0000580-2017

BEFORE:   BENDER, P.J.E., BOWES, J., and STEVENS*, P.J.E.

_____

\* Former Justice specially assigned to the Superior Court.

J-S26016-18

MEMORANDUM BY BOWES, J.:                                          **FILED JUNE 22, 2018**

Q.D. ("Mother") appeals from the October 11, 2017 decrees granting the petitions filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate her parental rights to three of her daughters, A.N.B. (born July 2008), N.H.D. (born November 2009), and J.J.B. (born March 2011).[1]  We affirm.

A.N.B., N.H.D., and J.J.B. became known to DHS in April 2015 when DHS received a report that Mother's five children were residing with their maternal great-uncle, M.W., who reported that Mother had previously left all five children home with $700 to purchase food and necessities.[2]  While Mother apparently intended to leave for one week, the record does not disclose how long she was actually away from the home.  When the children depleted the funds, they contacted M.W., who took them into his home.  As of the date of DHS's initial involvement with the family, the children had been residing with

_____

[1] Mother purports to also challenge the trial court's decision to change the children's permanency goals to adoption.  However, the orders attached to her respective notices of appeal did not address a goal change, and our review of the certified records in the termination of parental rights cases and the concomitant dependency proceedings did not reveal any contemporaneous goal change orders.  As the change of a child's permanency goal to adoption is not a prerequisite to the involuntary termination of parental rights, the omissions do not impact our review herein.  ***See In re M.T.***, 101 A.3d 1163, 1166 (Pa.Super. 2014) (*en banc* ) ("a goal change from reunification to adoption is not a necessary prerequisite to the initiation of involuntary termination proceedings.").

[2] DHS did not petition to terminate Mother's parental rights to the two oldest children.

- 2 -

M.W. for approximately one month. Mother's eldest child, then-fourteen-year-old E.P., informed DHS that Mother frequently left her and her younger siblings alone and unsupervised for several days at a time. In May 2015, DHS obtained protective custody of all five children. On June 15, 2015, the trial court adjudicated A.N.B., N.H.D., and J.J.B. dependent.

Mother maintained intermittent contact with DHS and the children over the course of their placement. She did not visit the children from June 2015 through December 2015. Joe Sargent, the case manager assigned to the family through CUA Wordsworth ("CUA"), first spoke with Mother in December 2015, and found that she remained accessible to the children between that date and July 2016. However, after July 2016, Mother neglected to contact the children or Mr. Sargent for nine months.

On May 23, 2017, approximately one month after Mother's most recent reappearance, DHS filed petitions for the involuntary termination of Mother's parental rights to A.N.B., N.H.D., and J.J.B. After appointing legal counsel for Mother and the children, the trial court conducted an evidentiary hearing on the petitions.[3] DHS presented the testimony of Mr. Sargent. Mother testified on her own behalf. At the conclusion of the hearing, the trial court entered decrees granting the petitions to involuntarily terminate Mother's parental

---

[3] The trial court appointed Andre Martino, Esquire, as legal counsel for all three children. The children's best interests were represented during the evidentiary hearing by a guardian *ad litem*, Curley Cole, Esquire.

rights to A.N.B., N.H.D., and J.J.B. pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), and (b).

On November 6, 2017, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal.[4]

Mother raises the following issues for review:

1. Did the [t]rial [c]ourt err in terminating [Mother's] parental rights under Pa.C.S. Section 2511?

2. Did the [t]rial [c]ourt err in finding that termination of parental rights best served [A.N.B.'s, N.H.D.'s, and J.J.B.'s] developmental, physical and emotional needs under sub-section 2511(b)?

3. Did the [t]rial [c]ourt err in changing [A.N.B.'s, N.H.D.'s, and J.J.B.'s] goal to adoption?

Mother's brief at vi.[5]

We review these claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

---

[4] On December 11, 2017, we consolidated these appeals *sua sponte*.

[5] As there are no goal change orders before this Court in the instant appeal, we do not address the third issue listed in Mother's statement of questions.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2) and (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of § 2511(a) as well as (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we will focus our analysis on § 2511(a)(2), and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Our Supreme Court set forth our inquiry under § 2511(a)(2) as follows:

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

***In re Adoption of S.P.***, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ***In re A.L.D.*** 797 A.2d 326, 337 (Pa.Super. 2002). In this vein, "[a] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***Id***. at 340.

Mother argues that at the "time of the hearing, [she] certainly demonstrated a serious intent to recultivate the parent child relationship as well as a willingness and capacity to undertake the parental role." Mother's brief at 3. She asserts that she obtained full time employment, completed a drug and alcohol program, had negative drug screens, and attended visitations with her children that were productive. ***Id***. Mother also points to the fact that she was actively searching for housing. ***Id***. In sum, she claims, "[t]here was no evidence introduced which would establish that the conditions causing the original placement with DHS were not remedied." ***Id***. at 4. We disagree.

The trial court found clear and convincing evidence to terminate Mother's parental rights pursuant to § 2511(a)(2). Specifically, the court concluded that it "heard credible evidence regarding Mother's failure to perform parental duties, and inability to remedy the conditions which led to [A.N.B.'s, N.H.D.'s, and J.J.B.'s] removal and placement." Trial Court Opinion, 1/16/18, at 17. As the trial court noted, while Mother appeared to have

eventually accomplished certain parenting goals relating to substance abuse and employment, those achievements were never confirmed, and Mother neglected the remaining objectives. It concluded, "Mother did not comply with the parental objectives and her whereabouts were unknown from July 2016 until April 2017." *Id*. Moreover, the court found Mother's testimony regarding her alleged progress and undocumented accomplishments unpersuasive and unworthy of belief. Stated plainly, the trial court was "not persuaded that Mother can or will remedy the conditions which brought [A.N.B., N.H.D., and J.J.B.] into court supervision. Nor [was] the [c]ourt persuaded that Mother will be able to fulfill her parental responsibilities in the future." *Id*.

Our review of the certified record supports the trial court's finding of sufficient grounds for termination under § 2511(a)(2). Mother's reunification objectives included pursuing drug and alcohol treatment, attending supervised visitations with A.N.B., N.H.D., and J.J.B., and complying with all services that CUA provided. N.T., 10/11/17, at 32. During Mother's initial conversation with the agency, she acknowledged having drug and alcohol issues. *Id*. at 33. In January 2016, Mother attended Gaudenzia for drug and alcohol treatment, but did not complete the program. *Id*. at 33-34. From July 2016 through April 2017, Mother had no contact with A.N.B., N.H.D., J.J.B., or the CUA caseworker, Mr. Sargent. *Id*. at 36, 38-39. While Mr. Sargent knew that Mother enrolled in a drug and alcohol treatment program at Keystone in February 2017, Mother did not document her participation prior to the hearing. *Id*. at 35, 51, 53. Thus, Mr. Sargent did not have the opportunity to speak to

anyone at Keystone regarding Mother's program or confirm that she completed treatment. *Id*. at 53. In addition, Mr. Sargent testified that Mother tested positive for marijuana in August 2016, and that the results of the most recent screens were unavailable. *Id*. at 36-37, 38. To the extent Mother visited A.N.B., N.H.D., and J.J.B., those interactions never progressed beyond supervised visitation. *Id*. at 38. Nevertheless, Mr. Sargent testified that Mother's supervised visitations with A.N.B., N.H.D., and J.J.B. went "really well" and were appropriate. *Id*. at 51.

As it relates to the housing component of Mother's reunification goals, a CAU home assessment determined that her current living arrangements were not appropriate for reunification. *Id*. at 39. At the time of the hearing, Mother lived with her paramour in his mother's home. *Id*. at 39, 51. There is insufficient room for three children. *Id*. at 51. While Mother acknowledged that she did not have a place for A.N.B., N.H.D., and J.J.B., she argued that she could provide all of the other necessities for her children. *Id*. at 56, 59. In contrast to Mother's optimistic perspective, Mr. Sargent testified that Mother did not make substantial progress with her case plan and that she still is not in a position to reunify with A.N.B., N.H.D., and J.J.B. *Id*. at 40.

All of the foregoing evidence supports the trial court's conclusion that, while Mother may have made some progress toward her parenting goals, her actions were too little too late. As the trial court observed, "[Mother] has not complied with other required objectives, and has not recognized what her Children have been subject to, and what their needs are." Trial Court Opinion,

1/16/18, at 17. As the trial court was within its discretion to reject as inadequate Mother's new-found commitment to her children after a two-year absence, we will not disturb the court's conclusion that she is unable or unwilling to remedy the underlying condition that brought the children into placement. *See In re A.L.D.*, *supra* at 340 (Pa.Super. 2002) (parent's vow to cooperate after long period of uncooperativeness may be rejected as untimely or disingenuous.).

Having found that DHS presented sufficient evidence to terminate Mother's parental rights pursuant to § 2511(a)(2), we next address Mother's challenge to the trial court's § 2511(b) analysis. In reviewing the evidence in support of termination under § 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as

- 10 -

well. Additionally, section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." ***In re K.Z.S.***, 946 A.2d 753, 762 (Pa.Super. 2008). Moreover, in addition to considering the existence of a beneficial bond with a parent, the court may emphasize the safety needs of the child. ***See In re K.Z.S.***, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests).

Mother asserts that the trial court erred in its determination that termination of her parental rights is in the best interests of A.N.B., N.H.D., and J.J.B. She bases her argument on testimony that the children have a bond with her and that their visitations go "really well." Mother's brief at 7-8.

In articulating its needs-and-welfare analysis pursuant to § 2511(b), the trial court emphasized the children's beneficial bond with their preadoptive foster parent over the superficial attachment they share with Mother. The court explained,

> There was a bond with Mother but that bond is a recognition of a figure. Mother remains as a figure in the Children's lives. The real parenting and the real love and the real care, concerned safety, welfare, education, emotional support has come from

- 11 -

another person. Mother has declined to put herself in a position where that could occur and will not be able to in the future.

Trial Court Opinion, 1/16/18, at 21; N.T., 10/11/17, at 61.

Our review of the certified record supports the trial court's finding that, although there may be some bond with Mother, the termination of Mother's parental rights would be in the best interests of A.N.B., N.H.D., and J.J.B. In particular, A.N.B., N.H.D., and J.J.B. continue to reside in a preadoptive home certified through Northern Children Services. N.T., 10/11/17, at 40-42. A.N.B. and N.H.D. have resided in the home since December 2015, and J.J.B. has lived there since September 2016. *Id*. They are safe and their needs are being met. *Id*. at 41.

The children attend an accelerated charter school and they are excelling due to the foster mother's dedication to their education. *Id*. at 42. All three children are on the school's honor roll. *Id*. at 42-43. A.N.B., N.H.D., and J.J.B. call the foster mother "mom-mom" or "grand-mom." *Id*. at 43. She takes the children on trips with her family and dedicates time to reassure them that they are loved. *Id*. at 42-43. Mr. Sargent opined that A.N.B., N.H.D., and J.J.B. have thrived in the preadoptive foster home. *Id*. at 46-47. He believes the children love their preadoptive foster mother and view her as a role model and their primary caregiver. *Id*. 43-44.

In contrast to the connection that the children have with the preadoptive foster mother, Mr. Sargent testified that since A.N.B., N.H.D., and J.J.B. have not resided with Mother for several years, they do not look to her for parental

support. *Id*. at 45-46. In fact, the children's lack of attachment to Mother is evident from their behavior during the supervised visitations. For example, Mr. Sargent observed that when the children first came into care, they exhibited anxiety when the periods of Mother's supervised visitations concluded; however, two years later, there is no stress when the visits end, and A.N.B., N.H.D., and J.J.B. return to the preadoptive foster home. *Id*. at 45. In sum, Mr. Sargent opined that there would be no irreparable harm to A.N.B., N.H.D., or J.J.B. if the trial court terminated Mother's parental rights because all three children recognize that their preadoptive foster mother, rather than Mother, provides them the love and comfort that they crave. Mr. Sargent ultimately concluded that the children are secure in their knowledge that they are loved by "somebody that really . . . has [their] best interest[s] at heart." *Id*. at 46.

Mindful that a trial court can "consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent" and "the importance of continuity of [those] relationships[,]" we find sufficient evidence in the certified record to sustain the trial court's needs and welfare analysis. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quoting *In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010)). It was within the trial court's discretion to conclude that terminating Mother's parental rights in order for A.N.B., N.H.D., and J.J.B. to attain permanency with their preadoptive foster

parent satisfied the children's developmental, emotional, and physical needs and welfare.

As we find that the certified record supports the trial court's conclusion that DHS presented clear and convincing evidence in favor of terminating Mother's parental rights to A.N.B., N.H.D., and J.J.B. pursuant to 23 Pa.C.S. § 2511(a)(2) and (b), we do not disturb it.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/18